**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LORA CAMPBELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.  08-0722-KD-N** |
| | ) | |
| **ALLSTATE INSURANCE and** | ) | |
| **KELLY SERVICES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**ORDER**</u>

This action for unlawful discrimination brought pursuant to the Family Medical Leave

Act of 1993, 29 U.S.C. § 2601, *et seq*, (FMLA), is now before the Court on the motion for

summary judgment filed by defendant Allstate Insurance and memorandum in support, plaintiff

Lora Campbell's response, the reply, and the parties' supporting evidentiary submissions (docs.

59-62, 64-66, 67).  Upon consideration of the foregoing and for the reasons set forth herein, the

motion for summary judgment is **GRANTED**.

I. <u>Background</u>

    A. <u>Complaint</u>

Plaintiff Lora Campbell (Campbell) was an employee of Kelly Services, Inc., (Kelly) on

assignment to Allstate Insurance (Allstate).  On December 16, 2008, Campbell filed a complaint

pursuant to the FMLA wherein she brings one count for retaliation.  Campbell claims that she

was "denied full benefits and rights under the FMLA in that she was retaliated against based

upon her exercise of FMLA rights to which she was entitled and her employment was

wrongfully terminated." (doc. 32).

B. <u>Factual Background</u>[1]

1. Campbell first worked for Allstate in Mobile, Alabama, from December 2006 until February 2007 in the flood department.  She was hired through Kelly, a temporary employment service.  In April 2007, she began to work for Allstate as an assistant to Leo Eucare, catastrophe administrative manager at Allstate's catastrophe center in Mobile, Alabama.  Her job was designated as a catastrophe administrative manager assistant or "CAM assistant".  She reported directly to Eucare. (doc. 64)[2]

2. On Saturday, August 9, 2008, three of Campbell's children were in a motor vehicle accident.  One child died and two children were seriously injured and hospitalized in Birmingham, Alabama. (docs.1, 64)

3.  Campbell notified her supervisor at Kelly, Robin Dreibelbis, who approved Campbell's time off.  Eucare was also notified regarding Campbell's time off.  In September 2008, Campbell notified Kelly and Allstate that she had returned to Mobile, Alabama, but her children would require medical appointments and therapy sessions. (Doc 64)

4.  Kelly did not provide Campbell with any documentation or FMLA forms to comply with the FMLA or to formally provide notice to Allstate. Campbell did not notify anyone at Allstate that she was on FMLA leave (doc. 64).

5.  Eucare testified that after Campbell left work in August 2008, three catastrophes

---

[1] When resolving a motion for summary judgment, the Court construes the evidence and the factual allegations in a light most favorable to the plaintiff.  <u>Miller v. King</u>, 384 F.3d 1248, 1258-59 (11th Cir. 2004) citing <u>Burton v. City of Belle Glade</u>, 178 F. 3d 1175, 1187 (11th Cir. 1999) (When ruling on a motion for summary judgment, the court "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party.")

[2]  The facts contained in the paragraphs which cite to document 64 are adapted from Campbell's response to the motions for summary judgment (doc. 64).

occurred in September 2008: Hurricane Gustav, Hurricane Ike, and a Category D storm in the

Ohio-Michigan region (doc. 64-3, at 62-66).  Eucare testified that he contacted Kelly after

Hurricane Gustav, around mid September 2008, to obtain a temporary CAM assistant and Kelly

assigned Dana Lollar to work for Eucare as a CAM assistant in the Deck 1 office.  She began

work around September 15, 2008.[3]  (doc. 64-3, at 59-61).

     6.  Eucare testified that his initial "intent" was to hold Campbell's position for her but

then there were "three catastrophes virtually in consecutive order".  That fact coupled with the

uncertainty as to when Campbell "was coming back, kind of forced [Eucare] to say that [he]

needed an assistant." (doc. 64-3, Eucare deposition at 67).

     7. When asked whether there was "a plan in place" for "when and if" Campbell returned

from leave "as far as going back to her old position at the time that you made the decision to fill

the spot", Eucare testified that

> As we were assessing the damage caused by Hurricane Ike, it was clear to me that
> we were going to need as much help as we could get from the operations and
> support capacity, so whenever Lora was ready to come back, we could have used
> her help and she could have been working in the same capacity as she was

---

[3] Lollar signed a sworn statement on personal knowledge as follows:

     1. I was employed by Kelly Services, Inc. on or abound September 15,
2008.  I worked on assignment with Leo Eucare at Allstate in Mobile, Alabama.

     2.  While working for Allstate, I performed administrative duties and
directly reported to Leo Eucare.  I was initially assigned to the building known as
Dec One.  I was later assigned to perform duties at both Dec One and Dec Two
shortly after Lora Campbell's assignment ended in October 2008.  My job title
was CAM assistant.

     3.  My assignment with Allstate ended around March or April of 2009.  I
continued to work directly for Leo Eucare throughout my assignment.

(doc. 64-14).

previously

(doc. 64-3, p.12, Eucare deposition at 63:16-23).

8.  Eucare's job duties changed because of the three catastrophes.  Eucare began to

handle issues not related to the operations of the building.  Also, Beverly Sweeney and Jennifer

Petersen, other Allstate employees, split their regular duties to assist with Eurcare's old duties,

including supervising CAM assistants.  Peterson was the CAM in Deck One and Sweeney was

the CAM in Deck Two (doc. 64-3, at 70-71, 73, 76).  Eucare testified that  "after things settled

down, so to speak, for those catastrophes, I went back to my old role and [Sweeney and

Peterson] went back to their full-time positions" (doc. 64-3, at 71).

9.  After the increase in work due to the storms a new office was opened which was

referred to as Deck Two (doc. 64-3, at 70).  Eucare testified as follows:

> We definitely needed one office assistant and as these three catastrophes, . . .
> accumulated . . .  it was determined that any more help that we would get would
> be useful. . . . I knew that for certain, because at that time, when these three
> catastrophes came into play, we were opening another office, which is the Deck 2
> office, . . . .

(doc. 64-3, at 64-65).

10. Eucare testified that prior to Campbell's return, his favorable opinion regarding

Campbell's interpersonal skills with other employees had changed.  Eucare's favorable opinion

changed based on the reports of other people who worked with Campbell.  (doc. 64-3, at 42-51,

88).

11. Campbell's records from Kelly Services indicate the following:

> [Campbell] returning to work on Wednesday, 10/15.  She will keep the same
> position - but will be located in another building & will work under Beverly
> Sweeney, since Leo's duties have been reassigned.  Beverly will be out of the
> office until Wednesday morning, so [Campbell] will start then rather than on
> Monday 10/13.

(doc. 65-4, p. 43)

    12.  On October 15, 2008, Campbell returned to work at Allstate and was assigned to work for Beverly Sweeney, a different manager than before she took leave. (doc. 64)

    13.  Campbell worked in the "wind department" in Deck One before her leave and that upon her return she worked in the "wind department" in Deck Two (doc. 64-2, Campbell deposition, at 41-42).  Campbell was paid the same rate and had the same benefits (doc. 64-2, at 42), and the same hours. (doc. 64-2, at 85)

    14.  Campbell testified that her job duties were not the same (doc. 64-2, at 42-48), but she could not recall exactly what her duties were or exactly which duties were different except that at Dec One she interacted with the cleaning people and maintained the phone and the inventory (doc. 64-2, at 45-47) and helped someone stock the employee starter kits and at Deck Two she did not have a helper. (doc. 64-2, at 72)  Campbell testified that "[f]rom my view of it, I didn't have any of the responsibilities basically. I don't recall being able to function in the same capacity as before where it came to the building itself." (doc. 64-2, at 46-47).

    15.  Campbell testified that she called Robin Dreibelbis at Kelly on her first day back, and on the next three days, to report that "the atmosphere was not good" and that she "felt that [she] was in a hostile environment" because of the "way that Ms. Sweeney was treating" her. (doc. 64-2, at 75-76).  Campbell testified that Sweeney "raised her voice" to Campbell, that while working on the phone Sweeney "put her hand back" in Campbell's face, that Sweeney would cut off Campbell while speaking, and would not adequately respond when Campbell needed something. (doc. 64-2, at 75-76)  Campbell testified that Sweeney had not supervised her before. (doc. 64-2, at 75-76).

    16.  On October 21, 2008, Sweeney notified Kelly to terminate Campbell's assignment

with Allstate.  According to Sweeney the precipitating event of the termination was Campbell's

failure to complete the desk kits.[4] (Doc. 64-8, Sweeney deposition at 22-23)

    17.  Sweeney testified that during the five days they worked together,[5] Campbell

would indicate through her mannerisms, such as pursed lips and not looking me in
the eye and her language, phrases like Leo likes it this way or I have all that
information from before, that she didn't like being in Deck 2.

    And she was - - she seemed very hostile to me.  I sensed - - excuse me, I
mentioned previously that I had very limited contact with her, had no real reason
to like her or dislike her, just, you know, courteous contact was basically all we
had ever had.

    And when she came over to Dec 2, she just seemed to radiate hostility, as
if she just couldn't stand to be in the same room with me or couldn't stand to be
in the Deck 2 building.

    And I was very surprised, because prior to that I hadn't . . . I don't recall
having heard anything negative about her prior to that.  And so it was just very
upsetting for me.

    And so then when we got to that point when I asked her to do this fairly
simple task and she just refused to do it and told me she had done it, I just thought
that I couldn't work with such a person in such a situation.

(doc. 64-8, at 23-24)

    18. Eucare testified that Lollar did not assume the duties of Campbell in Deck Two after

Campbell was fired but "did deal with some issues at Deck 2" (doc. 64-3, at 74).  Eucare testified

that no one was hired to fill Campbell's position at Deck 2 because Allstate "basically . . . split

[Campbell's] duties among two people" - Beverly Sweeney and Jason Wright, another Kelly

temporary employee (doc. 64-3, at 79).  Eucare testified that at some point after February 21 or

---

    [4] Campbell testified that she completed the desk kits (doc. 64-2, at 73).

    [5]  The first two days of Campbell's return, she worked with Eucare on a specific project,
but she was aware that she would be supervised by Sweeney (doc. 64-2, at 41, 48).

23, 2008, Lollar assumed some of the duties in Deck 2 in addition to duties in Deck 1. (doc. 64-3, at 75).

II. Summary judgment standard

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[6]  A factual dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); see also Information Systems and Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." Id.; accord Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1993), cert. denied, 507 U.S. 911, 113 S.Ct. 1259 (1993).  Moreover, "what is considered to be 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes." Cottrell v. Caldwell, 85 F.3d 1480, 1486 (11th Cir. 1996).

The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party

---

[6]   Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).

Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. Id.  The non-movant bears "the burden of coming forward with sufficient evidence on each element that must be proved." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).  If  "a party...fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," Rule 56(c) mandates that summary judgment be entered against that party.  Celotex, 477 U.S. at 322, 106 S.Ct. at 2552.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert. denied, 507 U.S. 911, 113 S.Ct. 1259 (1993) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dept. of Children and Family Services, 358 F.3d 804, 809 (11th Cir. 2004), cert. denied, 543 U.S.1081,125 S.Ct. 869 (2005).

III. Applicable law

The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid

leave annually "[i]n order to care for the . . . son [or] daughter . . . of the employee, if such . . . son [or] daughter, . . . has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).  In order to be "eligible" for FMLA leave, the employee must be employed: "(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (2) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).  "The Act creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006).

Campbell claims that Allstate and Kelly retaliated against her for taking FMLA leave by failing to hold her position open and filling it with another employee and by firing her from her position on return.[7]  The Court of Appeals for the Eleventh Circuit has explained that

> the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, see 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave."). To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied.  O'Connor v. PCA Family Health Plan, Inc.,

---

[7]  In her response to the motion for summary judgment, Campbell argues that the failure to hold open her position is an "interference" with her rights under the FMLA and thus, appears to attempt to bring an interference claim by way of her response to the motion for summary judgment (doc. 64, p.3, 14-15).  Defendant Allstate correctly points out that Campbell did not bring a claim for interference in her complaint. Campbell cannot amend her complaint by way of a response to a motion for summary judgment.  Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  Therefore, any argument that Allstate failed to hold open Campbell's position and filled that position with another employee, will be addressed solely as a possible retaliation claim and not as a claim for interference.

> 200 F.3d 1349, 1353-54 (11th Cir.2000); <u>King v. Preferred Technical Group</u>, 166
> F.3d 887, 891 (7th Cir.1999).  In contrast, to succeed on a retaliation claim, an
> employee must demonstrate that his employer intentionally discriminated against
> him in the form of an adverse employment action for having exercised an FMLA
> right. <u>King</u>, 166 F.3d at 891.  In other words, a plaintiff bringing a retaliation
> claim faces the increased burden of showing that his employer's actions "were
> motivated by an impermissible retaliatory or discriminatory animus." <u>Id</u>.

<u>Strickland v. Water Works and Sewer Bd. of City of Birmingham</u>, 239 F.3d 1199,1206-1207

(11th Cir. 2001).

In her response, Campbell concedes that there is no direct evidence of retaliation and that

the Court must apply the same burden-shifting framework established in <u>McDonnell Douglas</u>

<u>Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817 (1973) (doc. 64, p.15);  see <u>Strickland</u>, 239 F.3d at

1207.  Under this framework, Campbell bears the initial burden of establishing a prima facie case

of discrimination, <u>i.e.</u>, retaliation, by a preponderance of the evidence and if she does so, a

presumption of discrimination arises. <u>Christian v. Cartersville City Schools Bd. of Educ.</u>, 167

Fed Appx. 89, 91 (11th Cir. 2006) citing <u>Texas Dept of Community Affairs v. Burdine</u>, 450 U.S.

248, 254, 101 S.Ct. 1089 (1981).  "Demonstrating a prima facie case is not onerous; it requires

only that the plaintiff establish facts adequate to permit an inference of discrimination." <u>Holifield</u>

<u>v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997).  In order to establish a prima facie case of

retaliation, Campbell must show the following: (1) that she engaged in statutorily protected

activity; (2) that she experienced an adverse employment action; and (3) that there is a causal

connection between the protected activity and the adverse action. <u>Hurlbert</u>, 439 F.3d at 1297.

> Once the employee establishes a prima facie case of retaliation, the burden shifts
> to the employer "to articulate a legitimate reason for the adverse action." <u>Hurlbert</u>
> <u>v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1297 (11th Cir. 2006). If the
> employer does so, the employee must then show that the employer's proffered
> reason was pretextual by presenting evidence "sufficient to permit a reasonable
> factfinder to conclude that the reasons given by the employer were not the real
> reasons for the adverse employment decision." <u>Id</u>. at 1298 (internal quotation

marks omitted). The employee may rely on evidence that he already produced to establish his prima facie case. <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir.1997); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 921 (11th Cir.1993).

<u>Martin v. Brevard County Public Schools</u>, 543 F.3d 1261, 1268 (11th Cir. 2008).

> A plaintiff can satisfy her burden of showing pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 450 U.S. at 256, 101 S.Ct. 1089. There must be sufficient evidence to allow a reasonable fact-finder to conclude that the employer's articulated reasons are not believable. <u>Jackson v. State of Ala. State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir.2005). This can be accomplished by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation. <u>Id.</u> The plaintiff must present significant and probative evidence of pretext in order to avoid summary judgment. <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1376 (11th Cir.1996).

> This court has explained that if the proffered reason was legitimate and nondiscriminatory, then the plaintiff must " 'meet [the proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.'" <u>Brooks v. County Comm'n of Jefferson County, Ala.</u>, 446 F.3d 1160, 1163 (11th Cir.2006) (quoting <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir.2000)). This court has further explained that "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.' " <u>Id.</u> (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original)).

<u>Davis-Dietz v. Sears, Roebuck and Co.</u>, 284 Fed.Appx. 626, 630 (11th Cir. 2008).

IV.  <u>Analysis</u>

As an initial consideration, Allstate does not dispute that Allstate was a "secondary employer" as contemplated under the FMLA.  As a secondary employer of Campbell, Allstate's duties in this circumstance are defined in 29 C.F.R. § 825.106(e) as follows:

> . . . The secondary employer is responsible for accepting the employee returning from FMLA leave in place of the replacement employee if the secondary employer continues to utilize an employee from the temporary placement agency, and the agency chooses to place the employee with the secondary employer. . . .

29 C.F.R. § 825.106(e).

Campbell concedes that there is no direct evidence of discrimination. Thus, Campbell has the burden to establish a prima facie case of discrimination, specifically, (1) that she engaged in statutorily protected activity; (2) that she experienced an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. Hurlbert, 439 F.3d at 1297. In that regard, the parties do not dispute that Campbell experienced an adverse employment action, i.e., termination.

Allstate disputes that Campbell engaged in statutorily protected activity because she cannot show that her leave should have been deemed FMLA leave. Allstate also argues that Campbell cannot show a causal connection between the alleged protected activity, taking FMLA leave, and her termination or Allstate's alleged failure to return Campbell to her exact CAM position. However, for purposes of this motion for summary judgment only, the Court will assume that Campbell presented sufficient evidence to establish her prima facie case.[8]

---

[8] It is questionable whether Campbell could meet her prima facie case. Assuming that she did engage in a protected activity, closeness in time standing alone is generally not sufficient to establish a causal connection when "there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000). "A decision maker cannot have been motivated to retaliate by something unknown to him." Id. Since Allstate is a corporate defendant, Campbell "must show that the corporate agent who took the adverse action was aware of [her] protected expression." Id. (citation omitted). Campbell provided no evidence that Sweeney was aware that Campbell had taken FMLA leave at the time Sweeney fired Campbell or that Eucare was aware that Campbell had taken FMLA leave at the time that he placed her with Sweeney, instead of placing her with him as his CAM assistant (a position which may not have existed when Campbell returned because of the change in job duties at that time). Undisputedly, Sweeney and Eucare knew that Campbell was on leave because of the fatal accident involving her children, but Campbell has presented no evidence to rebut their testimony that they did not know Campbell was on FMLA leave. Eucare testified that he never discussed FMLA leave "or anything like that" with Robin Dreibelbis (doc. 64-3, at 36). Sweeney testified that she had never had an employee under her supervision who requested FMLA leave (doc. 64-8, at 33). Campbell concedes in her response that no formal notice or documentation was

Therefore, the Court will next address whether Allstate has met its burden of articulating a legitimate, non-discriminatory reason for terminating Campbell and for failing to place Campbell in her former CAM position with Eucare.

Regarding Campbell's termination, Allstate states that its employee Sweeney terminated Campbell because of a bad attitude and poor work performance. Allstate asserts that Sweeney and Campbell had minimal, courteous contact before Campbell took leave. However, upon Campbell's return and her placement with Sweeney, Sweeney came to believe that Campbell had a bad attitude and failed to perform a task specifically requested of her. Allstate asserts that Sweeney did not know that Campbell had been on FMLA leave or leave which could be considered FMLA leave, and therefore, Sweeney could not have been motivated to retaliate against Campbell for taking FMLA leave.

Regarding Campbell's placement upon return, Allstate provides evidence that it accepted Campbell on assignment from Kelly after her leave and that Eucare placed Campbell in the CAM assistant position in Deck Two with Sweeney because a CAM assistant was needed there. Allstate asserts that Campbell's former position specifically with Eucare in Deck One no longer existed due to the change in Eucare's duties. However, Allstate asserts that they complied with the FMLA because Campbell was given a substantially similar CAM assistant position in which

_____

provided to Allstate by Kelly (doc. 64, p. 5, ¶ 7). Campbell does not offer any circumstantial evidence from which a reasonable fact-finder could infer that Sweeney and Eucare were on notice that Campbell's leave was taken under the FMLA. See Brungart, 231 F. 3d at 799 ("Because the evidence is unrefuted that Nelson, the decision maker, did not know that Brungart had requested and been scheduled for medical leave, Brungart failed to create a genuine issue of fact as to a causal connection between her termination and her scheduled leave or her request for it.)
    Moreover, as to the requirement of an adverse employment action, for the same reasons articulated *infra*, the Court would find that the placement of Campbell in the CAM assistant position in a different office does not constitute an adverse employment action.

she received the same pay.

The Court finds that Allstate has met its burden to "articulate a legitimate reason for the adverse action." <u>Hurlbert</u>, 439 F.3d at 1297.  Therefore, the Court now looks to whether Campbell can rebut these reasons as a pretext for retaliation.  To do so at the summary judgment stage, Campbell must either: 1) present evidence that there are weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in Allstate's proffered reasons such that a reasonable fact-finder could find that the proffered reasons are not credible or believable; or 2) present evidence from which a reasonable fact-finder could infer that discriminatory reasons more likely motivated the decision.

Campbell argues that Eucare made the decision not to return Campbell to her prior position and created a new position for her in order to retaliate against her, not because the work needs of Allstate dictated the new arrangement.  As evidence that Allstate's work needs explanation is merely pretext, Campbell points to the evidence that although Eucare testified that he changed his positive opinion about Campbell's interpersonal skills because one employee told him that Campbell was a mean person, that employee disputes having the conversation with Eucare.  The alleged discrepancy in the basis of Eucare's change of opinion of Campbell's skills is insufficient to show that Allstate's work needs explanation is merely pretext.  Also, assuming that Campbell could present evidence that Eucare did not want to accept Campbell back at Allstate because he no longer thought she was a "good employee", that evidence does not create an inference that his true motive was to retaliate against for her taking FMLA leave.  Assuming Campbell's premise is correct, that Eucare did decide she was no longer a good employee but knew he had to accept her back or risk violating FMLA, then the only reasonable inference to arise from that premise is that he set in course a plan to terminate her for not being a good

14

employee and not for taking FMLA leave.

Moreover, the evidence is unrebutted that while Campbell was on leave, Allstate experienced an increase workload which resulted in a change of assignments for many employees at Allstate.  However, despite Allstate's work needs and new assignments for other employees, Campbell was provided a substantially similar job, albeit in a different office. Rather than establishing that Campbell was given a different assignment, the evidence establishes that she was assigned a different supervisor.  The fact that Campbell did not want to work for a new supervisor is of no moment, and under the facts of this case is not a basis for a retaliation claim under FMLA.

Campbell also argues that she was terminated in retaliation for taking FMLA leave and not for the proffered reason that she had a poor attitude and work performance.  As evidence of pretext Campbell points out that she was fired for "not completing a minor task of refilling some starter boxes" and that Allstate did not counsel Campbell after a warning "as is the protocol when Allstate seeks to terminate a Kelly employee." (Doc. 64, p. 28)   Campbell also notes that after she was terminated her newly created position was eliminated. (Id. at 29).  Campbell argues that "Allstate and Kelly did the least amount possible in a bad faith effort to comply with FMLA and still to get away with not restoring Campbell to her job" (Id.)

Pretext is not supported by quarreling with Sweeney's decision to terminate Campbell based on a minor offense and bad attitude.  There is no dispute in the record, and in fact Campbell provides most of the evidence on the point, that the relationship between Sweeney and Campbell was at best tense.  It is clear that Campbell did not want to work for Sweeney. Campbell places the blame for the tense environment on Sweeney and Sweeney places the blame for the tense environment on Campbell's failure to perform and bad attitude.   However, the end

point is the only reasonable inference from the evidence is that Sweeney terminated Campbell because she didn't appreciate Campbell's attitude or work performance.  Campbell has failed to present any evidence that Sweeney's termination of Campbell was motivated by Campbell's FMLA leave, or that Sweeney even knew about Campbell's status as an FMLA recipient.   The FMLA does not cloak employees with heightened protections from supervisors who don't like them based on the employee's work performance or attitude.  In sum, Campbell has not offered any evidence from which a reasonable fact-finder could determine that she was subject to adverse employment actions in retaliation for taking FMLA leave.

V.  Conclusion

For the reasons set forth herein, defendant Allstate's motion for summary judgment is **GRANTED**.

**DONE** and **ORDERED** this 18th day of November, 2009**.**

 **s / Kristi K DuBose**
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**